## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

**JOHN C. SPAULDING,**

      **Plaintiff,**

**vs.**                             **Case No. 4:11cv605-MP/CAS**

**S. BASS, Z.Z. FORD,**
**H.E. GARTMAN, B. GOODWIN,**
**BRAD HOWARD, OFF. LANDRUM,**
**C. LAGO,[1] RONNIE WOODALL,**
**and MARTHA REYNOLDS,**

      **Defendants.**

_____/

## <u>REPORT AND RECOMMENDATION</u>

Plaintiff John Spaulding, an inmate proceeding pro se and in forma pauperis, initiated this case in November 2011.  ECF Nos. 1-2.  In April 2012, Mr. Spaulding's third amended complaint was dismissed for failure to state a claim.  ECF Nos. 19, 21-22.  Mr. Spaulding's appeal of that dismissal was successful and the case was remanded "to allow Defendants

---

[1] Throughout this litigation, this Defendant's surname has been listed as Lagos. Defendant Carla Lago filed a Declaration clarifying the correct spelling of her surname. ECF No. 249, Ex. I (ECF No. 249-8).  The proper spelling is used throughout this Report and Recommendation.

the opportunity to respond to Spaulding's third amended complaint."  ECF

No. 36 at 7-8.  At that time, the third amended complaint asserted claims

against five Defendants: Adams, Neel, Gartman, Lago, and Woodall.  ECF

No. 17.  Mr. Spaulding generally challenged the amount of time he spent in

disciplinary confinement in 2011, the loss of privileges, and delayed

medical treatment.[2]

After remand, ECF No. 37, Mr. Spaulding filed a motion requesting

leave to file an amended complaint.  ECF No. 38.  The motion was granted

and his proposed fourth amended complaint was filed.  ECF No. 39.

Mr. Spaulding's fourth amended complaint, ECF No. 41, greatly expanded

the claims raised in this case as well as the number of Defendants.

Instead of five Defendants, Mr. Spaulding named fifteen Defendants.  ECF

No. 41 at 1-3.  After delay in submitting the service copies, *see* ECF Nos.

---

[2] In the Order of remand, despite remanding for service of the allegations
presented in the "third amended complaint," it is not clear that the Eleventh Circuit
reviewed those allegations.  The Court recited several of Mr. Spaulding's allegations, for
example that Officer Jennings told him he would be disciplined for commission of a lewd
and lascivious act and a magnet and pink sheet were placed on his cell to label him as
a sexual predator.  ECF No. 36 at 2-3.  However, those allegations were presented in
the first amended complaint, ECF No. 13 at 12, but not the third amended complaint.
Additionally, Jennings was named as a Defendant in the first amended complaint, ECF
No. 13, but not the third amended complaint, ECF No. 17.

46, 54, Mr. Spaulding's fourth amended complaint was served.  It is that version of the complaint that is at issue in this case.

## Procedural History

Subsequently, Mr. Spaulding sought on numerous occasions to file additional amended complaints.  *See* ECF Nos. 81, 162, 174, 192, and 209.  Those motions were all denied.  ECF Nos. 84, 102, 163, 177, 178, 180, 186, 196, 212, 232, and 238.

The fourth amended complaint [hereinafter "complaint"], ECF No. 41, was brought against all Defendants in both his or her individual and official capacity.  ECF No. 41 at 3.  The complaint has been dismissed as to Defendants Jennings and Johnson for failure to serve process.  ECF Nos. 148 at 5; ECF No. 166.  The complaint was dismissed as to Defendants Tucker, Adams, and Neel for failure to state a claim.  ECF Nos. 148, 166. Defendants' motions to dismiss, ECF Nos. 74, 78, 97, and 118, were granted in part, ECF Nos. 148 and 166, and the claims brought against Defendants Bass, Ford, Gartman, Goodwin, Howard, and Landrum in their official capacities for monetary damages were dismissed.  ECF No. 166. The claims against Defendants Lago, Woodall, and Reynolds in their official capacities, and requests for declaratory and injunctive relief were

dismissed.  *Id.*  The case was remanded for further proceedings, including discovery, on the surviving claims which proceeded "against Defendants in their individual capacities only, limited to nominal damages only with the exception of Plaintiff's claims against Defendants Gartman and Madan" for which Plaintiff could request compensatory and punitive damages.  ECF No. 166 at 4.  Subsequently, the claim raised against Defendant Madan was dismissed for failure to serve process and for failure to state a claim. ECF No. 170, 179.

Thus, the claims proceed against Defendants Woodall, Ford, Landrum, Gartman, Howard, Bass, Lago, Reynolds, and Goodwin, who filed a motion for summary judgment.  ECF No. 249.  Mr. Spaulding also filed his own motion for summary judgment.  ECF No. 231.  The parties were advised of their responsibilities under Rule 56 and Local Rule 56.1 to file responses in opposition to the opposing party's motion for summary judgment.  ECF No. 252.  The motions are ready for review.

**Legal standards governing a motion for summary judgment**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  Thus,

summary judgment is proper "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986). The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp., 477 U.S. at 323, 106 S. Ct. at 2553. The non-moving party must then show[3] though affidavits or other Rule 56 evidence "that there is a genuine issue for trial" or "an absence of evidence to support the

---

[3] "Rule 56(e) . . . requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' " Owen v. Wille, 117 F.3d 1235, 1236 (11th Cir. 1997), cert. denied 522 U.S. 1126 (1998) (quoting Celotex, 477 U.S. at 324, 106 S. Ct. at 2553) (quoting Fed. R. Civ. P. 56(c), (e))). The nonmoving party need not produce evidence in a form that would be admissible as Rule 56(e) permits opposition to a summary judgment motion by any of the kinds of evidentiary materials listed in Rule 56(c). Owen, 117 F.3d at 1236; Celotex, 477 U.S. at 324, 106 S. Ct. at 2553.

nonmoving party's case." *Id.* at 325, 106 S. Ct. at 2554; Beard v. Banks,

548 U.S. 521, 529, 126 S. Ct. 2572, 2578, 165 L. Ed. 2d 697 (2006).

An issue of fact is "material" if it could affect the outcome of the case.

Hickson Corp. v. Northern Crossarm Co., Inc., 357 F.3d 1256, 1259 (11th

Cir. 2004) (citations omitted).  Additionally, "the issue of fact must be

'genuine'" and the non-moving party "must do more than simply show that

there is some metaphysical doubt as to the material facts."  Matsushita

Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348,

1356, 89 L. Ed. 2d 538 (1986) (other citations omitted).  "The mere

existence of some factual dispute will not defeat summary judgment unless

that factual dispute is material to an issue affecting the outcome of the

case."  McCormick v. City of Fort Lauderdale, 333 F.3d 1234, 1243 (11th

Cir. 2003) (quoting Chapman v. AI Transp., 229 F.3d 1012, 1023 (11th Cir.

2000)).

"[A]t the summary judgment stage the judge's function is not himself

to weigh the evidence and determine the truth of the matter but to

determine whether there is a genuine issue for trial."  Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 249, 106 S. Ct. 2505, 2511, 91 L. Ed. 2d 202

(1986).  "[T]here is no issue for trial unless there is sufficient evidence

favoring the nonmoving party for a jury to return a verdict for that party."

Anderson, 477 U.S. at 249, 106 S. Ct. at 2511 (noting that a "scintilla of

evidence" is not enough to refer the matter to a jury).  The Court must

decide "whether the evidence presents a sufficient disagreement to require

submission to a jury or whether it is so one-sided that one party must

prevail as a matter of law."  Hickson Corp., 357 F.3d at 1260 (quoting

Anderson v. Liberty Lobby, 477 U.S. 242, 252, 106 S. Ct. 2505, 2505, 91 L.

Ed. 2d 202 (1986)).  All "justifiable inferences" must be resolved in the light

most favorable to the nonmoving party, Beard, 548 U.S. at 529, 126 S. Ct.

at 2578 (noting the distinction "between evidence of disputed facts and

disputed matters of professional judgment."),[4] but "only if there is a

'genuine' dispute as to those facts."  Scott v. Harris, 550 U.S. 372, 380, 127

S.Ct. 1769, 167 L.Ed.2d 686 (2007) (quoted in Ricci v. DeStefano, 557

U.S. 557, 586, 129 S. Ct. 2658, 2677, 174 L. Ed. 2d 490 (2009)).  "Where

the record taken as a whole could not lead a rational trier of fact to find for

---

[4]  Noting that deference must be given "to the professional judgment of prison administrators," the Court stated that "[u]nless a prisoner can point to sufficient evidence regarding such issues of judgment to allow him to prevail on the merits, he cannot prevail at the summary judgment stage."  Beard, 548 U.S. at 530, 126 S. Ct. at 2578 (citing Overton v. Bazzetta, 539 U.S. 126, 132, 123 S. Ct. 2162, 2167, 156 L. Ed. 2d 162 (2003)).

the nonmoving party, there is no 'genuine issue for trial.'"  <u>Matsushita Elec.</u>

<u>Indus. Co.</u>, 475 U.S. at 587, 106 S. Ct. at 1356 (other citation omitted).

**The Relevant Rule 56(e) Evidence**

**a.    Defendants' Evidence**

On February 20, 2011, Mr. Spaulding received a disciplinary report

for Obscene or Profane Act.[5]  ECF No. 249, Ex. A, ¶2 (ECF No. 251-1); Ex.

B (ECF No. 249-2).  That disciplinary report was "rewritten . . . due to an

error in the original report."  Ex. B at ¶2.  Defendant Howard was the

investigating officer for the disciplinary report and delivered the disciplinary

report to Mr. Spaulding on February 28, 2011.  Ex. B at ¶4.  Defendant

Howard took a statement from Mr. Spaulding, and Mr. Spaulding was given

an "opportunity to request witnesses and evidence."  Ex. B ¶3.  Defendant

Howard advises that his job required him "to collect the evidence and

present it to the hearing team for review, not to . . . make judgments about"

an inmate's guilt or claims that an inmate's rights were violated by the

disciplinary report (DR).  *Id.*

---

[5] That disciplinary report is submitted as Attachment 1 to Defendant's Exhibit A.
ECF No. 251-1 at 4-5.

Mr. Spaulding was placed in administrative confinement on February 20, 2011, pending the disciplinary hearing.  Ex. A, ¶2, Att. 2.  The disciplinary hearing was held on March 3, 2011, and Mr. Spaulding was found guilty of the DR as charged.  Ex. B at ¶4.  Mr. Spaulding was sentenced to 30 days in disciplinary confinement.  Ex. A at ¶2; *see also* Ex. I at ¶3 (ECF No. 249-8).

It was noted that the disciplinary report had been re-written.  Ex. C at ¶2 (ECF No. 249-3).  "When a DR is presented to the hearing team, [the team is] not provided information about why the DR was rewritten, only that it was a rewrite."  *Id.*  "Generally, rewrites are ordered by the investigating officer due to some error in the original."  *Id.*  The Declaration of Defendant Goodwin states that nothing in Mr. Spaulding's disciplinary report indicates "the rewrite was improper."  *Id.*  Mr. Spaulding was found guilty of the charge because "there was sufficient evidence" and the facts stated in the report supported the charge.  *Id.* at ¶3.

On March 7, 2011, Mr. Spaulding was moved from administrative confinement to disciplinary confinement.[6]  Ex. A at ¶2.  Mr. Spaulding's 30

---

[6] Declarations filed by Defendants Gartman, Ex. A at ¶, and Lago, Ex. I at ¶3, explain that "sometimes inmates may be held in AC a few days waiting on space to open up" in disciplinary confinement.

days in disciplinary confinement lasted from March 7th until April 6, 2011.
*Id.*; *see also* Ex. I at ¶3.

While Mr. Spaulding was in confinement, he received a second
disciplinary report[7] for lewd and lascivious exhibition on March 18, 2011.
Ex. B at ¶5.  Mr. Spaulding testified in his deposition that the disciplinary
report was written by Defendant Ford, and that she "falsely accused" him.
Ex. L at 20 (ECF No. 249-10 at 6).  Defendant Ford declares that the
disciplinary report was "accurate."  Ex. D at ¶3 (ECF No. 249-4).

Again, Defendant Howard delivered the DR to Plaintiff on March 22,
2011.  Ex. B at ¶5.  Mr. Spaulding was again provided the "opportunity to
request witnesses and evidence and to submit a statement."  *Id.*
Mr. Spaulding "requested video evidence which he stated would show
Officer Landrum delivering him the Special Management Meal [on] the
evening of March 18, 2011."  *Id.*  Defendant Howard "reviewed the video,
and found that it did show what appeared to be a Styrofoam management
meal tray being delivered to [Mr.] Spaulding's cell," but Defendant Howard

---

[7] The second disciplinary report was submitted as Attachment 3 to Defendants'
Ex. A.  ECF No. 251-1 at 8-9.

states that it was "not part of the disciplinary charge at issue and had no relevance to the infraction that occurred earlier that morning."  *Id.*

Defendant Bass filed an affidavit advising that the disciplinary team "did not find any deficiencies" in the second disciplinary report written or the report "would have been sent back to be rewritten."  Ex. G at ¶2 (ECF No. 251-1).  Defendant Bass and the team concluded that the facts supported the charge against Mr. Spaulding and "there was sufficient evidence to find Spaulding guilty of [that] charge."  *Id.* at ¶3.

On March 24, 2011, Mr. Spaulding was found guilty of the second DR.  Ex. B at ¶5.  Mr. Spaulding was sentenced to 60 days in disciplinary confinement, "to be served consecutively with the time he was already serving."  Ex. A at ¶3.  "Adding another 60 days to the DC time that began on March 7, 2011," reveals Mr. Spaulding "should have been released on June 5, 2011."  *Id.*; *see also* Ex. I at ¶4.  Defendant Bass also asserted that Mr. Spaulding's punishment of 60 days in confinement "was within the range of sanctions permitted by the" Defendants' rules.  Ex. G at ¶3.

Defendant Ford also states that the rules do not require stating on a disciplinary report that an inmate was "placed on the special management meal" or that a magnet and pink sheet were placed on his door.  Ex. D at

¶3.  Defendant Ford states that "the magnet and pink sheet are a means of protecting female staff from" lewd behavior from inmates "who have a documented history of [such] actions."  *Id.* at ¶4.  She explains that the "magnet covers the cell window when a female is on the confinement wing and then it is removed when the female leaves."  *Id.*  "It is not punishment nor is it related to one DR."  *Id.*; *see also* Ex. F at ¶3.  (ECF No. 249-6). "The decision to cover an inmate's cell window in this manner is initially made by the Shift Supervisor, and is then reviewed by the Correctional Officer Chief (the Colonel) and by the Warden."  Ex. F at ¶3.

Mr. Spaulding acknowledged in his deposition testimony that the "pink sheet and magnet" were not used to identify that an inmate had been found guilty in a criminal court proceeding of a sexual offense or had been adjudicated as "a sexual predator."  Ex. L at pg. 11 (ECF No. 249-10 at 3). Rather, it's something that occurs at the institution.  *Id.*  Mr. Spaulding said that Lieutenant Johnson and Officer Jennings were the people who put the pink sheet and magnet on his cell door.  *Id.* at 15 (ECF No. 249-10 at 4).

On March 18, 2011, Lieutenant Johnson (formerly a Defendant named in this case) recommended that Mr. Spaulding be "placed on the special management meal for his lewd and lascivious exhibition

intentionally [directed] towards a female staff member."  Defendants'

Attachment 3 (ECF No. 251-1 at 11).  "[T]he special management meal

was used as means of deterring [that] type of behavior . . . ."  Ex. E at ¶4.

"Placement on the Special Management Meal was not done by the DR

team and is not punishment, but is a separate management tool used and

approved by security in certain instances to correct certain behavior."  Ex.

G at ¶5 (ECF No. 251-2 at 2).  Similar to the magnet and window covering,

a decision to serve an inmate the management meal is made by the Shift

Supervisor, then reviewed by the Correctional Officer Chief and the

Warden.  Ex. F at ¶4.

Defendant Landrum served Mr. Spaulding the management meal.

Ex. L at 26 (ECF No. 249-10 at 8).  Defendant Landrum states that as a

correctional officer, he did not "have any authority over whether an inmate

was placed on the management meal."  Ex. E at ¶2 (ECF No. 249-5).

Those in charge of security operations make those decisions and, as an

officer, Defendant Landrum "would have been provided a list of who was

on the meal and would have followed those directions."  *Id.*  "[A] hearing is

not required by Department rules" prior to placing an inmate on the

management meal, also called the "loaf."  *Id.* at ¶2.

The evidence reveals that Shift Supervisor Johnson interviewed Mr. Spaulding after issuance of the second disciplinary report.  Ex. F, attachment 1 (ECF No. 249-6 at 4).  Lieutenant Johnson advised Mr. Spaulding that he was recommending that Mr. Spaulding "be placed on the Management Meal due to his Lewd and Lascivious behavior."  *Id.*  It appears that Lieutenant Johnson also made the decision that the magnetic window cover should be used on Mr. Spaulding's cell window and would submit the request fo "Colonel R. Smith for further disposition."  *Id.*  Mr. Spaulding was placed on the management meal for only one day.  Ex. L at 20 (ECF No. 249-10 at 6).

The Institutional Classification Team (ICT) recommended that Mr. Spaulding be released from disciplinary confinement to close management on June 1, 2011.  Ex. A at ¶3.  Defendant Gartman is unaware "why the ICT decided to move Spaulding early" but advises that the ICT may have counted the total 90 day sentence as beginning "from the date of his hearing, instead of from when he was actually moved to DC."  *Id.*  Mr. Spaulding was not actually moved until June 4th,[8] which "may

---

[8] Mr. Spaulding was "placed in an Isolation Management Room on June 4, 2011," which is used "when an inmate is a danger to himself."  Ex. A at ¶3.

have been a bed space issue as well, or it could be that the ICT realized

the error in counting his DC days . . . ." *Id.*  Regardless, Defendant

Gartman suggests "there is no indication that Spaulding's movements . . .

were based on some improper motivation by staff." *Id.*  Defendant

Gartman also asserts that while she provided an initial grievance response

using an incorrect date, "it appears to be based on human error." *Id.*

Defendant Gartman declares she has "never knowingly falsified a

document during" her 22 year career with the Department of Corrections.

*Id.*

Defendants Gartman and Bass explain that Rule 33-601.308(3)(l),

F.A.C., directs the disciplinary hearing team to *"consider* the time served in

AC in determining the total number of days of recommended DC time."  Ex.

A at ¶4; Ex. G at ¶4.  "It is not a requirement that the credit for AC time be

given."  Ex. A at ¶4; *see also* Ex. F at ¶6; Ex. H at ¶3 (ECF No. 249-7).

Defendant Gartman, along with Patricia Herring and Defendant

Woodall, met on April 27, 2011, as the ICT to consider whether an inmate's

behavior and institutional adjustment warrant a change in their Close

Management level.[9]  Ex. A at ¶5.  Mr. Spaulding's Classification Officer,

Defendant Lago, recommended that Mr. Spaulding's level be increased

from CM-III (the lowest, least restrictive level) to CM-II based on his

"pattern of predatory actions towards female staff members during the

review period."  *Id.*  The ICT agreed with Defendant Lago's

recommendation.  *Id.*  "However, the ICT is not the final authority on the

matter."  *Id.*  The ICT's recommendation is sent to the State Classification

Office [SCO] for review.  *Id.; see also* Ex. F at ¶7.

Mr. Spaulding attempted to compare his situation with another

inmate, Johnny Cross, but Defendant Gartman advises that CM decisions

are made "on a case by case basis and take into account overall security

risks and institutional adjustment, not just one DR."  Ex. A at ¶6.  The ICT

recommended that inmate Cross's CM status be increased from CM-III to

CM-II, but the SCO "determined that because Cross only had one lewd act

in 5 years, he could continue to be observed in CM III."  *Id.*[10]

---

[9] Inmates on Close Management are reviewed every 6 months.  Ex. A at ¶5.

[10] Mr. Spaulding provided the SCO decision for inmate Cross.  ECF No. 231 at
182-183.  That exhibit confirms that the ICT recommended Mr. Cross's CM status be
increased, but he SCO concluded: "He can continue to be observed at CM3."  *Id.* at
183.  The basis was that Mr. Cross had "only one lewd act DR in almost 5 years."  *Id.*

Defendant Gartman clarifies that on May 1, 2011, Mr. Spaulding had a fight with his cellmate while he was in disciplinary confinement and "broke his right pinky finger." Ex. A at ¶7. Mr. Spaulding claims that a month later, on June 2, 2011, he wrote a grievance concerning his broken finger. *Id.* Defendant Gartman consulted with the Chief Health Officer (CHO) to respond to the grievance[11] and, in that particular case, the CHO advised "that if there was a need for further medical treatment," Mr. Spaulding should "sign up for sick call." *Id.* Defendant Gartman stated that if she had seen that Mr. Spaulding was injured and needed immediate medical care, she would have ensured that he received it. *Id.* In Mr. Spaulding's case, Defendant Gartman understood that the "medical records and x-ray" taken of Mr. Spaulding's finger showed "no evidence of a broken finger." *Id.*

Defendants also submitted the Declaration of Albert Carl Maier, a medical doctor, who reviewed Mr. Spaulding's medical records. ECF No. 251, Ex. J. Dr. Maier found that Mr. Spaulding was evaluated by medical staff on May 4, 2011, for his complaint of injury to the pinky finger on his

---

[11] The grievance response was filed as Defendants' Attachment 6. ECF No. 251-1 at 22.

right had.  Ex. J at ¶3.  The physician reviewed his chart and ordered an x-ray, which was taken on May 19, 2011.  "Evaluation of the hand showed full range of motion and no indication of injury."  *Id.*  Dr. Maier declares that he reviewed the two x-rays, giving "specific attention to the pinky finger and saw no evidence of remote ore recent injury.."  *Id.*  "The x-ray report stated [Mr.] Spaulding's hand was normal."  *Id.*  The medical records show that Mr. Spaulding continued "to complain of pain in his hand although there continued to be no evidence of injury."  *Id.*  On September 15, 2011, Mr. Spaulding was again evaluated by a doctor who "noted no deformity to the hand."  *Id.* at ¶4.  Dr. Maier states his medical opinion, based on review of the medical records, that Mr. Spaulding's finger was not broken in May 2011.  *Id.* at ¶5.  "Had [that] injury occurred, it would have been visible in the x-ray, and there would have been swelling an bruising present."  *Id.*

## b.    Plaintiff's Evidence[12]

---

[12] After Mr. Spaulding filed his motion for summary judgment, ECF No. 231, an Order was entered noting that Plaintiff's motion was unauthorized and not in compliance with the Rules of this Court.  ECF No. 236.  Mr. Spaulding's motion was 37 pages in length, and he did not request leave to exceed the 25-page limit of then Local Rule 7.1(A).  Other issues concerned the fact that Mr. Spaulding submitted a copy of his eighth amended complaint as an exhibit to his motion. ECF No. 231at 38-52, but that is not the operative pleading in this case, and most of the attached exhibits were improperly labeled.  Mr. Spaulding was informed that there "can only be one exhibit A, one exhibit B, and so forth."  *Id.*  Mr. Spaulding was given the opportunity to file an amended motion in compliance with Local Rule 56.1(A), with clearly identified exhibits

Mr. Spaulding submitted his own declaration, ECF No. 231 at 2-11, which has been considered. Mr. Spaulding makes clear that Lt. Johnson ordered the special management meal and placement of the magnet and pink sheet on March 18, 2011.  ECF No. 231 at 2.  Defendant Ford wrote the second disciplinary report for lewd or lascivious exhibition.  *Id.* at 3.

Mr. Spaulding states that he did not commit the disciplinary offenses as charged.  ECF No. 231 at 2-3.  He said that the management meal was provided without a hearing or preparation of a DC6-218 form, and is "a form of punishment" for violating Rule 33-601.314(1-6).  *Id.* at 2.  Despite his arguments to the disciplinary hearing team, consisting of Defendants Bass and Reynolds, he was found guilty as charged.  *Id.* at 3-4.

Mr. Spaulding contends that the Department's "usual practice" for procedural or technical errors in disciplinary reports, or for duplicated charges, the report is "dismissed."  *Id.* at 4.  Mr. Spaulding quotes Rule 33-601.307(4)(b) and contends Defendant Howard, "the investigator took it upon himself to have the D.R. rewritten, not the disciplinary team during a hearing."  *Id.* at 6-7.  Nevertheless, he was found guilty of the first

_____

which could be readily located.  Mr. Spaulding did not file an amended motion, despite having been given additional time in which to do so.  *See* ECF Nos. 241, 248, 252.

disciplinary report[13] (February 20, 2011 date) written by Defendant Ford,

and supported by witness statements of Officer Jennings and Lt. Johnson.

*Id.* at 4.  Mr. Spaulding states that the hearing team consisted of Defendant

Goodwin and Lt. Johnson, and he was sentenced to 30 days in disciplinary

confinement "without giving him credit for the days he" spent in

administrative confinement.  *Id.* at 7.  He contends he was found "guilty

even though there was a clear procedural error" and argues the charge

should have been dismissed.  *Id.*  Mr. Spaulding points out that Defendants

Woodall, Lago, and Adams denied his grievance and appeal.  ECF No. 231

at 5.

On March 22, 2011, Defendant Lagos served Mr. Spaulding with a

Close Management review recommendation.  ECF No. 231 at 6.  He

asserts that the recommendation labeled him "as a sexual predator and"

---

[13] Mr. Spaulding submitted a copy of the first disciplinary report (log # 230-110182) as Exhibit B.  ECF No. 231 at 166-168.  That report was dated February 20, 2011, and charged him with "Obscene Profane Act."  *Id.* at 167.  The report was written by Officer Nettles and approved by Michael Carlton.  *Id.*  A note on the report indicates the report was not delivered to Mr. Spaulding but "rejected" by Defendant Howard on February 28, 2011.  *Id.*  The report was then re-written that same day.  *See* Ex. C (ECF No. 231 at 169).  The re-written disciplinary report (log # 230-110189) is submitted as Exhibit C.  The statement of facts section is the same between the original and re-written disciplinary reports, with the addition of this concluding language in the re-written report: "It should be noted that at the time of this incident inmate Spaulding was alone in the cell.  This report is a re-write of log #230-110182)."  ECF No. 231 at 169.

upgraded his close management status from CM-III to CM-II.  *Id.*  Mr. Spaulding says that the I.C.T., consisting of Defendants Herring, Gartman, and Woodall, approved the recommendation.  *Id.*  He also advised that on April 8, 2011, the I.C.T. "revoked [his] visitation privileges for 6 months" because of the Lewd & Lascivious disciplinary report (log # 230-110269).[14]

Mr. Spaulding provided the health services record which noted he reported to sick call on May 4, 2011, complaining of "right hand" pain after being involved in a fight.  ECF No. 231 at 186.  The location of the pain was noted as: "5th finger side of hand."  *Id.*  The medical record shows the skin around the injury was pink (no hematoma), warm, without numbness or tingling, and he was able to wiggle his fingers.  *Id.*  There was "moderate" swelling, but with no deformity present.  The medical record indicated Mr. Spaulding had a "possible fracture and/or dislocation" and his chart was to be referred to the doctor for review and x-ray request.  *Id.*  The x-ray request was approved by Dr. Elio Madan on May 4, 2011.  *Id.* at 187.  The x-ray was taken on May 19, 2011.  *Id.*  Mr. Spaulding was given the results on May 25, 2011, which was "normal."  *Id.* at 189; *see also* ECF No.

---

[14] Mr. Spaulding submitted that report which he titled as Exhibit B.  ECF No. 231 at 97-105.

231 at 193-194.  The radiology report stated there was "no evidence of fracture or dislocation."  ECF No. 231 at 193.

Mr. Spaulding returned to sick call on June 17, 2011, again complaining of pain in his right hand.  ECF No. 231 at 191.  Again, he had no numbness, tingling, or deformity and could wiggle his fingers.  *Id.*  No swelling was noted on that date.  *Id.*

Mr. Spaulding submitted an x-ray report which was prepared in September 2014 at Jackson South Community Hospital.  ECF No. 231 at 156.  The findings were: "normal osseous mineralization and alignment without acute fracture.  Mild osteoarthritic changes are seen at the first carpal metacarpal joint otherwise joint spaces are well maintained."  *Id.*  The report stated "[t]here is deformity of the tuft of the third finger distal phalanx likely related to old post-traumatic deformity."  *Id.*

**ANALYSIS**

In the current posture of this case, the claims against Defendants Rucker, Jennings, Johnson, Adams, and Neel have been dismissed.  The surviving claims from the fourth amended complaint are (1) due process claims against Defendants Ford, Howard, Landrum, Woodall, Bass, Reynolds, Goodwin, Lago, Gartman; (2) Eighth Amendment claims for

"cruel and unusual punishment" against Defendants Ford, Landrum,

Gartman, and Woodall; (3) Eighth Amendment claim for deliberate

indifference to serious medical needs by Defendant Gartman; and (4)

double jeopardy claims against Defendants Bass, Reynolds (ECF No. 41 at

12), Lago, and Gartman (ECF No. 41 at 12-13).  Each of the claims are

addressed in the order listed.

## A.    Due Process Claims

The Due Process Clause of the Fourteenth Amendment prohibits

state action that deprives "any person of life, liberty, or property, without

due process of law."  U.S. CONST. amend. XIV.  While prisoners may "claim

the protections of the Due Process Clause," Wolff v. McDonnell, 418 U.S.

539, 556, 94 S.Ct. 2963, 2974, 41 L.Ed.2d 935 (1974),[15] due process does

not exist in a vacuum.  Due process exists to protect a liberty interest.

Thus, an inmate is entitled to the due process protection outlined in Wolff

only if he can show the deprivation of a "protected liberty interest."  In the

usual case, the forfeiture of gain time is a protected liberty interest.

---

[15] Wolff v. McDonnell held that before an inmate could lose good-time credits, the Due Process Clause requires prisoners be given advance written notice of a charged disciplinary violation, a written statement of factual findings, and the right to call witnesses and present documentary evidence where such would not be unduly hazardous to institutional safety or correctional goals.

Mr. Spaulding did not lose any gain time.  Therefore, summary judgment is

not appropriate for Mr. Spaulding absent a showing that his injury "is within

the scope of the Due Process Clause."  Kirby v. Siegelman, 195 F.3d 1285,

1290 (11th Cir. 1999) (holding that an inmate who has not been convicted

of a sex crime "is entitled to due process before the state declares him to

be a sex offender") (citing Bass v. Perrin, 170 F.3d 1312, 1318 (11th Cir.

1999)).

In Sandin v. Conner, 515 U.S. 472, 115 S.Ct. 2293 (1995), the

Supreme Court stated "that there are two circumstances in which a

prisoner can be deprived of a liberty interest beyond the deprivation

associated with the prisoner's confinement."[16]  Wallace v. Hamrick, 229 F.

App'x 827, 830 (11th Cir. 2007).  "First, a liberty interest may arise from the

'Due Process Clause of its own face,' which extends procedural safeguards

to a prisoner when his liberty is restrained in a way that exceeds the

sentence imposed by the court."  Wallace, 229 F. App'x at 830 (quoting

Sandin).  "Secondly, states may create liberty interests by conferring

certain benefits to prisoners, the deprivation of which 'impose[s] atypical

---

[16] The loss of a liberty interest is a more complex determination "in the context of a prison, because prisoners have already been deprived of their liberty in the ordinary sense of the term."  Bass v. Perrin, 170 F.3d 1312, 1318 (11th Cir. 1999).

and significant hardship on the inmate in relation to the ordinary incidents of prison life.'" <u>Wallace</u>, 229 F. App'x at 830 (quoting <u>Sandin</u>).  As noted above, Mr. Spaulding's sentence has not been altered because he did not lose gain time.  Thus, to demonstrate a due process claim under <u>Sandin</u>, it must be shown that Mr. Spaulding suffered an "atypical and significant hardship . . . in relation to the ordinary incidents of prison life.'" <u>Bass</u>, 170 F.3d at 1318 (citing <u>Sandin</u>, 515 U.S. at 484, 115 S.Ct. at 2300).        **1.**

**Management Meal**

Mr. Spaulding contends that he was entitled to due process and a hearing before he was placed on the management meal for one day. Although Defendants argue that it is a "management tool" and not punishment, for present purposes it is accepted that the management meal is employed after a prisoner engages in improper behavior.  *See* FLA. ADMIN. CODE R. 33-602.223(3),(4).[17]  There are procedures in place that

---

[17] The Rule states that "[i]nmates in any confinement status may be placed on the special management meal for creating a security problem by any of the following acts: (a) The throwing or misuse of food, beverage, food utensils, food tray, or human waste products; (b) Spitting at staff; (c) The destruction of food trays or utensils; (d) Any other acts that would place staff in jeopardy if a serving tray or utensils were provided. Rule 33-602.223(4) specifically directs that "[i]nmates on close or maximum management status may be placed on the special management meal as a result of intentional, unauthorized exposure of genitalia to staff."  FLA. ADMIN. CODE R. 33-602.223(4).

should be followed prior to placing an inmate on the management meal.

However, even *if* those procedures were not followed in Mr. Spaulding's

case,[18] a prisoner does not have a protected liberty interest in receiving a

particular type of meal in prison.  The Constitution requires meals to be

---

[18] The summary judgment materials demonstrate an approval process prior to serving an inmate the management meal, with the decision being made by the Shift Supervisor, then reviewed by the Correctional Officer Chief and finally, the Warden.  Ex. F.  Rule 33-602.223(5) states that "[w]hen an employee observed inmate behavior that he believes meets the criteria for application of the special management meal, the employee shall prepare Form DC6-218, Special Management Meal Report, and forward the report to the chief of security for review."  FLA. ADMIN. CODE R. 33-602.223(5).  The form has not been provided as evidence.  Additionally, the rule requires:

> If the chief of security determines that the behavior cannot be corrected through routine counseling or by established disciplinary procedures, a discussion shall take place at the inmate's cell between the inmate, the officer in charge, and the reporting officer, if needed. The officer in charge shall complete the discussion section of the report. The Special Management Meal Report shall document the reasons for recommending the special management meal and shall include a summary of the inmate's comments or objections. When an inmate has been recommended for placement on the special management meal, the chief health officer or his designee shall indicate on the Special Management Meal Report whether there is any medical reason that would prohibit placing the inmate on special management meal status. When there is a medical problem, the chief health officer or his designee shall determine whether the inmate can be placed on the special management meal or whether an alternative special meal can be prescribed. No inmate shall be placed on special management meal status without medical concurrence. The chief of security shall then forward the report to the warden for approval.

> (c) The warden or duty warden shall approve or disapprove all recommendations for placement on the special management meal based on the criteria set forth in subsection (2) above.

FLA. ADMIN. CODE R. 33-602.223(5).

nutritionally adequate, but "prison food need not be 'tasty or aesthetically

pleasing.'"  LeMaire v. Maass, 12 F.3d 1444, 1456 (9th Cir. 1993) (finding

inmate's allegations about the use of Nutraloaf did not "rise to the threshold

level of a deprivation that satisfies Wilson's objective component.") (quoted

in Meddler v. Buss, No. 4:10CV532 SPM/WCS, 2011 WL 7143584, at *4

(N.D. Fla. Dec. 5, 2011), report and recommendation adopted, No.

4:10cv532-SPM/WCS, 2012 WL 360090 (N.D. Fla. Feb. 2, 2012)).

Because Mr. Spaulding does not have a protected liberty interest in

receiving a particular kind of meal, summary judgment should be granted in

favor of the Defendants on his due process claim concerning being served

a management meal on one day.

## 2.    Re-written Disciplinary Report

Mr. Spaulding challenges the fact that his first disciplinary report was

re-written instead of dismissed.  The evidence reveals Mr. Spaulding

received a re-written disciplinary report.  The report itself noted that it was

re-written.  The only change was the addition of one sentence stating

Mr. Spaulding was in his cell alone.  Otherwise, Mr. Spaulding was given

(1) advance written notice of the charges, (2) a written statement of the

reasons supporting the disciplinary charge, and (3) the opportunity to call

witnesses and present evidence.  He was provided all the process required under <u>Wolff v. McDonnell</u> and summary judgment should be granted in favor of Defendants.

Furthermore, to the degree Mr. Spaulding also asserts a claim for the denial of due process in his disciplinary hearings, that claim fails.  First, he was not deprived of gain time and lacks a protected interest.  Second, even if he had a protected interest, he was provided due process under <u>Wolff</u>. The failure to note on a disciplinary report that Mr. Spaulding would be given a management meal is unrelated to the action which formed the basis for the disciplinary charge.  It is an irrelevant failure, if a failure at all.

### 3.  Confinement Time

Mr. Spaulding claimed that he was not given credit for time served in administrative confinement.  ECF No. 231 at 17.  Prison disciplinary proceedings are not the same as criminal sentencing.  Prison officials are not required to count "time served" in administrative confinement as part of the number of days imposed as punishment when directing a prisoner's placement in disciplinary confinement.  Rule 33-601.308(3) provides for consideration of the time an inmate has served in administrative confinement when determining how many days the inmate should serve in

disciplinary confinement.  There is no requirement for administrative confinement credit and, thus, there was no violation of Mr. Spaulding's due process rights when he was placed in disciplinary confinement without giving him credit for time spent in administrative confinement.  Summary judgment should be granted in favor of the Defendants on this claim.

Moreover, Mr. Spaulding's placement in disciplinary confinement for a total of 90 days was not a violation of his due process rights either. Placement in confinement alone is not sufficient to state a due process claim, *see* Rodgers v. Singletary, 142 F.3d 1252, 1253 (11th Cir. 1998) (finding that an inmate was not deprived of a constitutionally protected liberty interest when he was placed in administrative confinement as result of an allegedly false disciplinary report), nor is punishment in disciplinary confinement or segregation after a disciplinary hearing.  *See* Sandin, 515 U.S. at 485, 115 S.Ct. at 2301 (noting that "[d]iscipline by prison officials in response to a wide range of misconduct falls within the expected perimeters of the sentence imposed by a court of law.").  Such events come within the ordinary incidents of prison life.   Furthermore, administrative confinement "for short periods of time does not implicate a liberty interest under the Due Process Clause."  Whitsett v. Cannon, 139 F.

Supp. 3d 1293, 1303 (M.D. Fla. 2015) (citing <u>Sandin</u>, 515 U.S. at 485–87,

115 S.Ct. at 2301–02 (thirty days); <u>Rodgers v. Singletary</u>, 142 F.3d 1252,

1253 (11th Cir. 1998) (two months)).  Mr. Spaulding was held in

administrative confinement for just a "few days" and is insufficient as a Due

Process claim.

Mr. Spaulding came forward with no evidence demonstrating a "major

disruption in his environment," and provided no evidence showing that his

segregation was a "significant deprivation" from the presumed benefit of

being housed in general population.  There is no evidence that Mr.

Spaulding was held in disciplinary confinement beyond the 90 day

sentence imposed, and no evidence that he suffered an "atypical" or

"significant hardship."  <u>Smith v. Regional Dir. of Fla. Dep't of Corr.</u>, 368

Fed.Appx. 9, 13 (11th Cir. 2010) (dismissing prisoner's claims because he

failed to allege an atypical and significant hardship) (cited in <u>Whitsett</u>, 139

F. Supp. 3d at 1304).  Summary judgment should be granted in favor of the

Defendants on this claim as well.

### 4.  Magnet and Pink Sheet

The evidence concerning placement of the magnet and pink sheet on

Mr. Spaulding's cell window reveals he was not subjected to any discipline

or harm.  Mr. Spaulding was not identified to the inmate population as

having committed a particular criminal sexual offense such that he was

placed in danger.  He was not "branded a sex offender" in violation of Kirby

v. Siegelman, 195 F.3d 1285, 1291 (11th Cir. 1999) (holding that inmates

"have a liberty interest in not being branded a sex offender.").  The pink

sheet protected female staff from abusive and offensive behavior, but there

is no evidence that Mr. Spaulding was subjected to "stigmatizing

consequences" which arise from "the labeling of a prison inmate as a sex

offender."  Kirby, 195 F.3d at 1291 (quoting Neal v. Shimoda, 131 F.3d

818, 829 (9th Cir. 1997).  The magnet and pink sheet had nothing to do

with outside criminal charges and were only placed on his cell window

temporarily when a female officer was on the confinement wing, but is

removed when the female officer left the wing.  This due process claim is

insufficient as well.

### 5.    Classification Status

Mr. Spaulding does not have a protected interest in his classification

status.  Adamson v. McNeil, No. 3:08cv231-RV/EMT, 2008 WL 5231869

(N.D. Fla. Dec. 12, 2008) (finding no constitutionally protected liberty

interest in the change of inmate's classification from CM-III to CM-II).

Moreover, Mr. Spaulding does not have a viable claim that he was treated differently than inmate Cross because Mr. Spaulding was not similarly situated to inmate Cross.  There is no evidence of unequal or disparate treatment and this claim is also insufficient.  Defendants' motion for summary judgment should be granted as to all of Mr. Spaulding's due process claims.

## B.     Eighth Amendment Claims

Mr. Spaulding asserted two different types of Eighth Amendment claims, one for "cruel and unusual punishment" against Defendants Ford, Landrum, Gartman, and Woodall, and one for deliberate indifference to serious medical needs by Defendant Gartman.  The Eighth Amendment[19] governs the conditions under which convicted prisoners are confined and the treatment they receive while in prison.  Farmer v. Brennan, 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).  Although the Amendment does not require comfortable prisons, it prohibits inhumane ones.  Id.  The Eighth Amendment guarantees that prisoners will not be

---

[19] "In the prison context, three distinct Eighth Amendment claims are available to plaintiff inmates alleging cruel and unusual punishment, each of which requires a different showing to establish a constitutional violation."  Thomas v. Bryant, 614 F.3d 1288, 1303-04 (11th Cir. 2010).  This case raises both a claim to the conditions of confinement and a deliberate indifference to medical needs claim, but not an excessive force claim.

"deprive[d] . . . of the minimal civilized measure of life's necessities."
Rhodes v. Chapman, 452 U.S. 337, 347, 101 S.Ct. 2392, 2399, 69 L.Ed.2d
59 (1981) (quoted in Chandler v. Crosby, 379 F.3d 1278, 1289 (11th Cir.
2004)).  "[B]asic human necessities include food, clothing, shelter,
sanitation, medical care, and personal safety."  Harris v. Thigpen, 941 F.2d
1495, 1511 (11th Cir. 1991) (cited in Collins v. Homestead Corr.l Inst., 452
F.App'x 848, 850-851 (11th Cir. 2011)).  "[T]o make out a claim for an
unconstitutional condition of confinement, 'extreme deprivations' are
required . . . ."  Thomas v. Bryant  614 F.3d 1288, 1304, 1306-07 (11th Cir.
2010) (concluding that non-spontaneous use of chemical agents on
inmates with mental illness violated the Eighth Amendment) (citing Hudson
v. McMillian, 503 U.S. 1, 9, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992)).  Here,
Mr. Spaulding has not submitted any evidence demonstrating that he
suffered an "extreme" deprivation.  There is no evidence that he was
denied clothing, shelter, sanitation, or safety.  Mr. Spaulding was not
deprived of meals, and service of one management meal is not a
constitutional deprivation.  Summary judgment should be granted on the
Eighth Amendment claim for cruel and unusual punishment.

Mr. Spaulding's remaining Eighth Amendment claim is also not supported.  Deliberate indifference to the serious medical needs of sentenced prisoners violates the Eighth Amendment's prohibition of cruel and unusual punishment.  Estelle v. Gamble, 429 U.S. 97, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976).  A "'serious' medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention."  Hill v. Dekalb Regional Youth Det. Ctr., 40 F.3d 1176, 1187 (11th Cir. 1994), abrogated on other grounds by Hope v. Pelzer, 536 U.S. 730, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002) (quoting Laaman v. Helgemoe, 437 F. Supp. 269, 311 (D. N.H. 1977)).  Deliberate indifference requires a plaintiff to show that a named defendant unnecessarily and wantonly inflicted pain or harm to a prisoner by depriving him of a basic human need.  Wilson v. Seiter, 501 U.S. 294, 111 S. Ct. 2321, 115 L. Ed. 2d 271 (1991).

Mr. Spaulding has not provided evidence demonstrating either that he had a serious medical need or was denied medical care.  Mr. Spaulding went to sick call complaining of pain on the fifth finger or his right hand.  Mr. Spaulding was evaluated by a nurse who suspected that his finger was

broken.  The nurse requested x-rays be approved.  The doctor approved

the request and x-rays were taken.  The x-ray result was "normal."  There

was "no evidence of fracture or dislocation."

Mr. Spaulding makes much of an x-ray report from September 2014.

The finding at that time was "deformity of the tuft of the third finger distal

phalanx likely related to old post-traumatic deformity."  That injury is not

related to Mr. Spaulding's fight in 2011.  The third finger is not the fifth

finger.  Moreover, Mr. Spaulding has not shown that *any* Defendant was

deliberately indifferent to his needs.  Summary judgment should be granted

on this Eight Amendment claim as well.

## C.     Double Jeopardy Claim

Mr. Spaulding contends he was subjected to double jeopardy by

Defendants Bass and Reynolds.  "The Double Jeopardy Clause provides

that no 'person [shall] be subject for the same offence to be twice put in

jeopardy of life or limb.'"  Hudson v. United States, 522 U.S. 93, 98, 118 S.

Ct. 488, 493, 139 L. Ed. 2d 450 (1997).  "The Double Jeopardy Clause

protects individuals against three distinct violations: (1) 'a second

prosecution for the same offense after acquittal'; (2) 'a second prosecution

for the same offense after conviction'; and (3) 'multiple punishments for the

same offense.'"  United States v. Mayes, 158 F.3d 1215, 1219 (11th Cir.

1998) (noting that "[p]rison officials have no authority to alter the inmates'

original criminal sentences" and rejecting a double jeopardy challenge to

subsequent criminal prosecution) (quoting North Carolina v. Pearce, 395

U.S. 711, 717, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969), overruled on other

grounds, Alabama v. Smith, 490 U.S. 794, 109 S.Ct. 2201, 104 L.Ed.2d

865 (1989)).  It has long been "recognized that the Double Jeopardy

Clause does not prohibit the imposition of all additional sanctions that could

. . . be described as punishment."  Hudson, 522 U.S. at 98–99, 118 S. Ct.

at 493 (quoting United States ex rel. Marcus v. Hess, 317 U.S. 537, 549,

63 S.Ct. 379, 387, 87 L.Ed. 443 (1943) (quoting Moore v. Illinois, 14 How.

13, 19, 14 L.Ed. 306 (1852))).  The Double Jeopardy Clause does not

apply to proceedings that are not "essentially criminal," Breed v. Jones, 421

U.S. 519, 528, 95 S.Ct. 1779, 44 L.Ed.2d 346 (1975), and the Supreme

Court has held that "[p]rison disciplinary proceedings are not part of a

criminal prosecution" such that the "full panoply of rights" is applicable.

Wolff v. McDonnell, 418 U.S. 539, 556, 94 S.Ct. 2963, 41 L.Ed.2d 935

(1974).

In that light, Mr. Spaulding's double jeopardy claim cannot succeed.

The placement of the magnet and pink sheet, change in classification

status, and service of the management meal for one day is not punishment

for double jeopardy purposes.  Frazier v. McNeil, No. 3:09cv340-WS, 2010

WL 893839, at *8 (N.D. Fla. Mar. 8, 2010) (finding that retention in close

management was not criminal punishment for double jeopardy purposes)

(citing Taylor v. Gomez, 182 F.3d 927 (9th Cir. 1999) (concluding that

inmate's double jeopardy argument lacked merit in that the district court

correctly reasoned that his custody classification "is not punishment, but

rather a method for housing inmates based on their behavior"); Langton v.

Berman, 667 F.2d 231, 233, 234 (1st Cir. 1981) (finding prison disciplinary

hearing in which prisoner was sentenced to 15 days isolation, loss of all

privileges and good time credits, did not constitute double jeopardy due to

"the essential differences between a disciplinary hearing and a criminal

trial"); Welch v. Epps, 103 F. App'x 828, 829 (5th Cir. 2004) (noting there is

decisional authority "which holds that a mere change in custodial status

either amounts to an 'increase' in the 'measure of punishment' for ex post

facto purposes" or "qualifies as a second 'punishment' for double jeopardy

purposes."); Garland v. Marfield, No. 3:08cv261-RV/EMT, 2009 WL 22283

(N.D. Fla. Jan. 2, 2009) (rejecting inmate's claim that his placement on CM-III status violated the Double Jeopardy Clause because he was already punished for the disciplinary infraction by serving time in disciplinary confinement); Butler v. McDonough, No. 2:06CV206-FTM-29SPC, 2007 WL 2071530, at *1 (M.D. Fla. July 17, 2007) (holding that double jeopardy "protections apply to criminal trials, not disciplinary hearings or subsequent inmate classifications utilized by jail officials to maintain safety and security at the jail.") (citation omitted).  Summary judgment should be granted in Defendants' favor on this claim as well.

**RECOMMENDATION**

In light of the foregoing, it is respectfully **RECOMMENDED** that Defendants' motion for summary judgment, ECF No. 249, be **GRANTED** as to all claims, and Plaintiff's motion for summary judgment, ECF No. 231, be **DENIED**.

**IN CHAMBERS** at Tallahassee, Florida, on August 10, 2016.


 s/     Charles A. Stampelos
**CHARLES A. STAMPELOS**
**UNITED STATES MAGISTRATE JUDGE**

## <u>NOTICE TO THE PARTIES</u>

**Specific, written objections to these proposed findings and recommendations must be filed within 14 days after being served with a copy thereof. <u>Any different deadline that may appear on the electronic docket is for the Court's internal use only and does not control.</u> A copy of the objections shall be served upon all other parties.  If a party fails to object to the Magistrate Judge's findings or recommendations as to any particular claim or issue contained in this Report and Recommendation, that party waives the right to challenge on appeal the District Court's order based on the unobjected-to factual and legal conclusions.  See 11th Cir. Rule 3-1; 28 U.S.C. § 636.  A party may respond to another party's objections within 14 days after being served with a copy thereof.**